**SIGNED THIS: January 18, 2013**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| DAVID L. DUCKWORTH, | ) | Case No. 10-83603 |
|       Debtor. | ) | |
| | ) | |
| | ) | |
| STATE BANK OF TOULON, | ) | |
|       Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 11-8037 |
| | ) | |
| CHARLES E. COVEY, Chapter 7 Trustee | ) | |
| for DAVID L. DUCKWORTH, | ) | |
|       Defendant. | ) | |
| | ) | |
| | ) | |
| CHARLES E. COVEY, Chapter 7 Trustee | ) | |
| for DAVID L. DUCKWORTH, | ) | |
|       Counter-Plaintiff, | ) | |
| | ) | |
| STATE BANK OF TOULON, | ) | |
|       Counter-Defendant. | ) | |

**O P I N I O N**

This matter is before the Court on cross motions for summary judgment filed by the Plaintiff and Counter-Defendant, State Bank of Toulon (SBT), and the Defendant and

Counter-Plaintiff, Charles E. Covey (TRUSTEE), as Chapter 7 Trustee for the estate of the Debtor, David L. Duckworth (DEBTOR). In its amended complaint to determine validity, priority and extent of liens, brought pursuant to Bankruptcy Rule 7001(2), SBT seeks a determination that it has a first priority security interest in proceeds remaining from the sale of farm equipment, after satisfaction of its loans securing purchase money security interests in the equipment. The TRUSTEE filed a counterclaim to determine that SBT has no security interest in the surplus proceeds. Alternatively, the TRUSTEE seeks to avoid SBT's security interest. Both SBT and the TRUSTEE seek summary judgment.

## JURISDICTION

This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(K), because it involves the determination of the validity, extent, or priority of liens. It is also a matter concerning the TRUSTEE'S administration of the estate and involves the allowance or disallowance of claims against the estate, so it is core under 28 U.S.C. § 157(b)(2)(A) and (B) as well.

## FACTUAL BACKGROUND

The DEBTOR, a farmer, filed a chapter 7 petition on November 23, 2010. Prior to filing bankruptcy, the DEBTOR had a lending relationship with SBT, which involved a number of loans. SBT made the following four loans to the DEBTOR to enable him to purchase certain items of equipment. On June 4, 2008, the DEBTOR executed a promissory note to SBT in the original principal amount of $61,570 and a commercial security agreement which described the collateral as a purchase money security interest in a 1990

John Deere 8760 4WD Tractor.  On that same date, the DEBTOR executed a second commercial security agreement which described the collateral as a purchase money security interest in a 1992 John Deere 4960 Tractor.  On September 17, 2008, the DEBTOR executed a promissory note to SBT in the original principal amount of $173,935 and a commercial security agreement which described the collateral as a purchase money security interest in a 2003 John Deere 9650 Combine, a John Deere 893 Corn Head, and new J & M 1150 Auger Wagon.  On March 17, 2009, the DEBTOR executed a promissory note to SBT in the original principal amount of $60,035 and a commercial security agreement which described the collateral as a purchase money security interest in a used 2005 John Deere 1770 NT 16 Row Corn Planter.  On April 20, 2009, the DEBTOR executed a promissory note to SBT in the original principal amount of $12,935 and a commercial security agreement which described the collateral as purchase money interests in a used Bush Hog 2615 Legend Batwing Mower and a new John Deere Z445 Lawn Mower with 54" deck.

The aforementioned notes and commercial security agreements (CSAs) are stock loan documents generated by Laser Pro software and are, save for the amounts of the debt and the description of the collateral, identical.  Each CSA provides that a security interest in the collateral is granted "for the payment of the Indebtedness."  "Indebtedness" is defined as follows:

> The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible

3

under this Agreement or under any of the Related Documents.

The word "Note" is also a defined term, and provides, except as particularized to each transaction with the amount and the date of each note:

> The word "Note" means the Note executed by DAVID L. DUCKWORTH in the principal amount of $ _____ dated _____, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

The term "Related Documents" is also a defined term, as follows:

> The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

The CSAs provide that they are governed by Illinois law. They also contain an integration clause stating "This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement." The TRUSTEE does not dispute that SBT held valid security interests in the equipment described in the CSAs and perfected its security interests.

In December, 2008, the DEBTOR obtained a large operating loan from SBT, signing a Promissory Note dated December 15, 2008, evidencing an open-end revolving line of credit loan of $1,100,000 with fixed rate interest at 5.75%. The Note requires a single, interest-only payment due on April 1, 2009, with payment of the entire balance due on April 1, 2010. On the second page of the Note, in the paragraph headed "collateral," it provides as follows:

> Borrower acknowledges this Note is secured by SECURITY AGREEMENT DATED DECEMBER 13, 2008 AND A MORTGAGE FROM DONALD R. DUCKWORTH, AS TRUSTEE OF THE DONALD R. DUCKWORTH LIVING TRUST TO THE STATE BANK OF TOULON DATED DECEMBER 15, 2008.

4

The DEBTOR also signed an Agricultural Security Agreement (ASA) dated December 13, 2008. The ASA describes the collateral as "All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Crops, Farm Products, Livestock (including all increase and supplies) and Farm Equipment." SBT filed a UCC Financing Statement containing a lengthy description of the collateral. The ASA identifies the secured Note as being dated December 13, 2008, rather than December 15, 2008.

A second large operating loan transaction between the DEBTOR and SBT occurred in January, 2010. The DEBTOR signed a Promissory Note in the amount of $950,000 dated January 29, 2010, evidencing an open-end line of credit for the purpose of paying "farm operating expenses only," with full payment due on July 1, 2010. The paragraph headed "Collateral" provides that "Borrower acknowledges this Note is secured by SECURITY AGREEMENT DATED DECEMBER 13, 2008." Both operating loans, also Laser Pro generated forms, contain the same stock definitions for the terms "Note," "Indebtedness," and "Related Documents."

After the filing of the Chapter 7 petition on November 23, 2010, SBT sought relief from the stay to repossess and sell its collateral. An order was entered on January 11, 2011, authorizing SBT to liquidate the property and directing it to hold the proceeds pending further order of the Court. The auction sale of the items of DEBTOR'S farm equipment subject to SBT's purchase money security interests generated net proceeds of $277,949.85, which resulted in a surplus of $46,488.35.[1] SBT filed this proceeding, seeking to apply the

---

[1] The surplus was attributable to three of the four loans. The collateral for the fourth loan netted slightly less than the loan's balance. SBT does not seek to have that deficiency paid in this proceeding.

5

surplus funds to the operating loans.

## ANALYSIS

It is the security agreement which embodies the intention of the parties and creates and defines the security interest. *Helms v. Certified Packaging Corp.*, 551 F.3d 675, 680 (7th Cir. 2008). Under UCC section 9-201(a), a security agreement is effective according to its terms between the parties, against purchasers of collateral, and against creditors. 810 ILCS 5/9-201(a). A dragnet clause is a provision in a security agreement by which the identified collateral may secure not only the debts specifically referenced in the security agreement, but also other unspecified debts, past and future, owed by the borrower to the lender.

Dragnet clauses have consistently been held to be valid and enforceable as a matter of Illinois law, as long as they are clear and unambiguous. *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 463 (7th Cir. 2007); *Metropolitan Life Ins. Co. v. American Nat. Bank & Trust Co.*, 288 Ill.App.3d 760, 767-69, 682 N.E.2d 72 (Ill.App. 1 Dist. 1997); *Stannish v. Community Bank of Homewood-Flossmoor*, 24 B.R. 761 (Bankr.N.D.Ill. 1982). Section 9-204(3), which governs the effectiveness of dragnet clauses in secured lending agreements, revised in 2001, provides as follows:

> Future advances and other value. A security agreement may provide that collateral secures, or that accounts, chattel paper, payment intangibles, or promissory notes are sold in connection with, future advances or other value, whether or not the advances or value are given pursuant to commitment.

810 ILCS 5/9-204(c).[2] The amendment, which added the initial phrase "A security

---

[2] Until July 1, 2001, section 9-204(3) provided as follows:
> Obligations *covered by a security agreement* may include future advances or other value whether or not the advances or value are given pursuant to commitment (subsection (1) of Section 9-105). (Emphasis added).

810 ILCS 5/9-204(3). The UCC Official Comment to that provision states that "under subsection (3) collateral may secure

6

agreement may provide," emphasizes and clarifies that a future advances or dragnet provision, while optional, must be set forth in writing as part of the security agreement in order for the security interest to cover debts not expressly identified therein. That principle has long been the rule under the UCC. *See* Grant Gilmore, *Security Interests in Personal Property,* § 35.5 (1965); *John Miller Supply Co. v. Western State Bank,* 55 Wis.2d 385, 199 N.W.2d 161 (Wis. 1972).

SBT contends that the surplus funds from the sale of the farm equipment securing the purchase money loans should be applied to the balance due on other debts owed it by the DEBTOR, specifically the Note dated December 15, 2008, in the original principal amount of $1,100,000. SBT submits the declaration of the loan officer, Douglas J. Blunier, who says he prepared all of the loan documents for all of the loans made by the DEBTOR, as well as an excerpt from his deposition stating that he believed, based on the terms of those security agreements, that each CSA secured not only the specifically referenced note, but all other loans which SBT had made to the DEBTOR.[3] In Count I of the Amended Complaint, SBT alleges that its lien on the excess funds is provided for by dragnet provisions in the CSAs themselves. SBT takes the position that the defined term "Indebtedness" includes "all promissory notes" whether "now or hereafter existing," including notes not related to the purchase money loan. The TRUSTEE maintains that the CSAs clearly and unambiguously do not contain dragnet clauses and that each CSA

---

future as well as present advances *when the security agreement so provides*." The comment also states "in line with the policy of this Article toward after-acquired property interest this subsection validates the future advance interest, *provided only that the obligation be covered by the security agreement.*" (Emphasis added).

[3]The TRUSTEE challenges the admissibility of Blunier's testimony. However, the Court's decision that neither the CSAs nor the ASA contain a dragnet provision, a determination favorable to the TRUSTEE, is premised solely on the unambiguous terms of the Laser Pro security agreements. Parol evidence is not admissible for the purpose of adding a dragnet clause to an integrated security agreement that does not contain one.

7

collateralized only the note specifically identified in that agreement. The TRUSTEE is correct.

The issue of contract construction raised by the parties here mirrors the issue considered by the Court in another adversary proceeding brought by SBT to determine the validity of its security interest in other assets being held by the TRUSTEE, *State Bank of Toulon v. Charles E. Covey, Trustee, et al.*, 2012 WL 986766 (Bankr.C.D.Ill. 2012)(issued March 22, 2012). At issue in that case was whether the ASA dated December 13, 2008, was ineffective to create a security interest because it misidentified the date of the secured note. Determining that the ASA was effective despite the misidentification, the Court considered whether the ASA contained a dragnet clause. As it claims here, SBT argued that the relevant definitional terms, carefully read, reflect an intent to secure all debts. In response, one of the Defendants argued that the definitions were circular, all eventually referring back to the single debt evidenced by a Note identified as dated December 13, 2008. Addressing those arguments, this Court stated:

> The definition of "Indebtedness" covers that misidentified instrument and "Related Documents." "Related Documents" includes all notes, agreements and other instruments *executed in connection with the Indebtedness.* The definition of "Indebtedness" includes "all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents." SBT argues that the words "all other indebtedness" are expansive. This Court disagrees. Those words are modified by the final two clauses: "for which Grantor is responsible under this Agreement or under any of the Related Documents." Those clauses operate to limit the covered indebtedness to the December, 2008 loan and none other. The Court agrees with [the Defendant] that the definitions are circular and do not, by their plain terms,

8

encompass any future debts.[4]

2012 WL 986766 at *6.

The definitions at issue there in the ASA are identical to the ones contained in the CSAs presently before the Court and the same reasoning and resolution is applicable here. The CSAs do not contain a customary future advances or dragnet provision. The Court agrees with SBT that the definitions are unambiguous, but determines that the security interest granted in each CSA covers only the purchase money loan identified therein. SBT does not contend that the December, 2008 operating loan was "executed in connection with" any of the purchase money loans at issue. Neither is the December 15, 2008 Note a renewal, extension, modification, refinancing, consolidation, or substitution of or for any of the purchase money loans. Lacking a broad dragnet provision, each CSA secured only the single debt specifically identified therein.

To the same effect is *In re Donckers*, 360 B.R. 905 (Bankr.W.D.Ark. 2007), where the court held that provisions similar to the ones at issue in this case did not constitute future advance clauses and did not cover subsequent loans made to the debtor. As the court noted, while the term "Related Documents" was implicitly expansive, it was restricted by a modifier that referred back to the narrowly defined "Indebtedness."

For these reasons, summary judgment on Count I of the Amended Complaint and Count I of the Counterclaim will be granted in favor of the TRUSTEE and against SBT.

In Count II of the Amended Complaint, SBT alleges an alternative theory in the event the Court determines that the security interest created by each CSA is limited to the

---

[4] The definitions permit the conclusion that a *limited* set of other debts could be secured, but only if "executed in connection with" the specific purchase money loan. However, in the prior proceeding, SBT did not contend that the DEBTOR obtained any other loans "in connection with" the December, 2008 operating loan. Likewise, here, SBT does not contend that any of the purchase money loans in question are related to or connected with each other.

9

purchase money loan and none other, which the Court has now determined. For its alternative theory, SBT relies upon the language in the ASA granting it a blanket barnyard security interest in farm assets, including equipment, farm equipment and proceeds therefrom. SBT contends that the ASA secures the $1.1M Note dated December 15, 2008, upon which a large unpaid balance remains, in excess of $500,000, so that the excess proceeds from sale of the equipment should be applied to reduce that balance. SBT is correct.

The TRUSTEE does not dispute that the ASA grants an interest in farm equipment and proceeds or that the tractors, combine, corn head, grain cart, planter and mowers sold at auction are properly categorized as "farm equipment." Instead, the TRUSTEE maintains that because the ASA misidentified the date of the December 15, 2008 Note, that Note is unsecured. He contends the controlling statute is UCC section 9-201, which provides that a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors. He interprets the phrase "according to its terms" to mean, in this case, that the ASA can only secure a Note dated December 13, 2008, since that is the date stated in the ASA, and cannot secure the Note dated December 15, 2008, which is the actual date of the Note signed by the DEBTOR. The Court rejected the TRUSTEE'S argument in its earlier opinion. 2012 WL 986766 at *4-5. The TRUSTEE invites the Court to reconsider that opinion and makes a lengthy argument as to why he believes the Court got it wrong the first time.

Upon review, the Court reaffirms its earlier reasoning and incorporates it here *in toto*. Based upon that reasoning, the Court draws the same conclusion reached in the earlier opinion, that the ASA secures the December 15, 2008 Note. The Court reasoned that

10

extrinsic evidence is admissible to determine whether value has been given as required by 810 ILCS 5/9-203(b)(1).[5] It was conceded that the DEBTOR had authenticated (signed) the ASA and had rights in the collateral. The TRUSTEE presented no evidence to dispute that SBT actually funded the $1.1M loan to the DEBTOR. He argued that the ASA's reference to an incorrect date for the Note, by itself, rendered the Note unsecured, even if value had been given by SBT's funding of the loan. The Court determined that since the three statutory predicates to effectiveness of a security agreement had been conceded or proved, that the ASA was effective between SBT and the DEBTOR to secure the December 15, 2008 Note, notwithstanding its misidentification of the Note's date. By the plain terms of 810 ILCS 5/9-201(a), once a security agreement is effective between the parties, *ipso facto*, it is also effective against purchasers of the collateral and against creditors.[6]

UCC section 9-201, addressing the general effectiveness of a security agreement, is closely aligned with section 9-203, dealing with the enforceability of a security interest. As a condition to enforceability, section 9-203 requires that the debtor has authenticated a security agreement that provides a description of the collateral. While that section also requires that "value has been given," it says nothing about how or even whether that value is to be described in the security agreement. So while the UCC requires that the secured party have given value, it does not regulate the description of the value, usually a loan, in

---

[5]How could it not be, since proof that value has been given is made by proving that loan proceeds have been delivered to the borrower, an event that is not established by the mere execution of loan documents. The parol evidence rule excludes extrinsic evidence offered to "alter, vary or contradict" the written agreement. *Asset Recovery Contracting, LLC v. Walsh Const. Co. of Illinois,* 2012 IL App (1st) 101226, --- N.E.2d ----, 2012 WL 5377802 (Ill.App. 1 Dist. 2012). Evidence that funds were advanced is consistent with the purpose of the ASA and fulfills one of the fundamental conditions to its effectiveness.

[6]On this basis, SBT's security interest is not avoidable by a hypothetical creditor, and thus not by the TRUSTEE. Summary judgment will therefore be entered for SBT on Count IV of the Counterclaim.

11

the security agreement. As discussed more fully below, the lack of UCC regulation means that general principles of contract law govern.[7]

The contention that parol evidence that the loan was funded is admissible only for the limited purpose of proving value was given, but not for the purpose of identifying that value to the particular loan intended to be secured, cannot stand. Implicit in the "value given" requirement is proof not only that funds were advanced but that the parties intended that the collateral secure repayment of those funds – of that particular loan. A security interest, after all, means an interest that secures payment or performance of an obligation. 810 ILCS 5/1-201(b)(35). The admission of parol evidence to prove that value has been given, necessarily permits the use of that evidence to establish the identification of the loan (the value actually given) that the parties intended to secure.[8]

This Court's reasoning is supported by the differentiation between a financing statement and a security agreement. The purpose of a financing statement is to give public notice to third parties of a security interest, thereby establishing the priority of that interest. Although a security agreement may be reviewed by subsequent lenders who are evaluating a potential loan to the same borrower, its primary purpose is not to provide notice to third parties, but rather to create an enforceable security interest in accordance with the requirements of Article 9 of the UCC and to set forth enforceable contract terms and

---

[7]Because "a description of the collateral" is mandated as an indispensable feature of a valid security agreement, § 9-201(b)(3)(A), and thus expressly regulated by the UCC, collateral description is strictly construed in favor of subsequent potential creditors. *See Helms, supra,* 551 F.3d at 680-81. This distinction neuters the TRUSTEE'S argument that since parol evidence is not admissible to add inadvertently omitted items of collateral to a security agreement (he relies heavily on *Matter of Martin Grinding & Mach. Works, Inc.,* 793 F.2d 592 (7th Cir. 1986) for this proposition), it should not be admissible to correctly identify as the secured debt a loan evidenced by a misdated note.

[8]It is imprecise to say that a security agreement secures a note. More accurately, a security agreement secures a debt that is evidenced by a note. Proof of the debt may be made through facts outside of the note, which, by itself, is only one piece of circumstantial evidence that a loan was made. Since a note is merely *evidence* of indebtedness, a loan and the borrower's repayment obligation exist and are legally enforceable even where the note is destroyed or lost or missing terms. *See* 810 ILCS 5/3-115 and 3-309.

12

convenants respecting that interest and the collateral. A security agreement is a contract between a lender and a borrower that is interpreted and enforced according to the rules of contract law, which rules permit mutual mistakes to be corrected in order to effectuate the true bargain that the parties made. To the extent a security agreement is enforceable between the borrower and lender, it is enforceable against creditors and purchasers of the collateral. 810 ILCS 5/9-201(a). That provision is a clear indication that issues of enforceability of a security agreement turn on general principles of contract law, not on considerations of the effect on third party creditors and purchasers, whose interests are expressly made subject to an enforceable security agreement. General principles of law and equity, including the law of contracts and the law relative to "mistake," supplement the provisions of the UCC. 810 ILCS 5/1-103(b).

Without any supporting authority, the TRUSTEE presumes that the error in the date of the Note renders the ASA ineffective between SBT and the DEBTOR. The Court disagrees. Generally, it is only a material mistake of fact going to the essence of the agreement that renders a contract void or rescindable for want of mutual assent. This is to be contrasted with a situation involving a scrivener's error, where the parties had a meeting of the minds, but a mistake was made when reducing the agreement to writing. *Molex Inc. v. Wyler,* 2005 WL 497812 (N.D.Ill. 2005); 27 *Williston on Contracts* § 70:93 (4th ed.). When a contract fails to conform to or express the real agreement or intention of the parties as a result of a scrivener's error, rescission is not a permissible remedy. *In re Tobacco Road Assoc., LP,* 2007 WL 966507 (E.D.Pa. 2007). Recission would be appropriate only if the mistake related to the basis of the bargain and materially affected the parties' performance of the contract. *Id.* Here, there is no evidence that because the ASA referred to the Note

13

as being dated December 13 rather than December 15, that the DEBTOR and SBT were somehow prevented from performing. There is no evidence that they were even aware of the error before the TRUSTEE raised it. All of the evidence in the record supports the conclusion that the date discrepancy was a minor scrivener's error that had no effect on the parties or their performance under the ASA. The misidentification of the date of the secured Note by two days is not the kind of serious error that would render the agreement ineffective between the parties.[9] All of the evidence in the record supports the conclusion that both the DEBTOR and SBT intended the debt evidenced by the $1.1M Note to be secured by the ASA. In this Court's view, the ASA was effective to secure that debt from the time of its execution forward, and thus was in full force and effect on the bankruptcy filing date.

The TRUSTEE fixates on the § 9-201(a) phrase "effective according to its terms" as preempting state contract law and mandating the ineffectiveness of the ASA. While courts have refused to permit collateral description errors to be corrected to the prejudice of a subsequent lender, no court has declared a security agreement void because of a promissory note date discrepancy. As discussed herein, while a subsequent lender may be entitled to rely on the collateral description set forth in a security agreement without further inquiry, the same is not true with respect to the debt description.

The TRUSTEE makes a lengthy argument about what a hypothetical reasonable

---

[9]The TRUSTEE mischaracterizes the Court's prior ruling as having "reformed" the ASA. An action for reformation of a contract or an instrument is appropriately pursued by one party against the other to correct misstated or omitted terms that will govern their future rights and remedies against each other. Third parties have no standing to sue for reformation. The issue here is whether the ASA was effective to secure the $1.1M Note as of the bankruptcy filing date. The provisions of Article 9 of the UCC, supplemented by principles of contract law, dictate that it was. The common law cause of action for reformation had nothing to do with that determination.

14

creditor might discover when investigating the question of SBT's security interest. His argument is premised on unsupported and faulty assumptions. He claims that a reasonable subsequent lender would have examined the ASA and would have "found" no note dated December 13, 2008; that the lender would have read the ASA and concluded that it contained no dragnet clause; and that the lender would "have had no reason" to contact SBT. The Court is left to wonder how a subsequent lender could ever "know" what promissory notes existed or what debts were claimed to be secured without contacting the prior lender. In the exercise of reasonable care in order to protect its own interest, it seems apparent that a subsequent lender would want to know with some reasonable certainty and assurance what debts were secured by the collateral and what balances remained on those debts. Would a reasonable subsequent lender look at a complex security agreement and assume it to be not worth the paper it is written on without knowing what interest the prior lender claimed to have? The last thing a reasonable lender wants is a priority dispute with another financial institution.

The TRUSTEE relies upon *Helms, supra*, for the proposition that a "prudent creditor need look no further than the security agreement." 551 F.3d at 681. The scope of the court's statement, however, is limited by its context, that being the issue of a security agreement's description of collateral. In context, the court opined that since it is the security agreement, not the financing statement, which must resolve the question as to adequacy of the description of collateral, a prudent creditor need look no further than the security agreement's collateral description to ascertain the property subject to the lien, and may rely on that description without further inquiry. 551 F.3d at 680-81.

15

Descriptions of collateral, whether item by item or sorted into statutory categories, are, by common practice and usage, precise and complete. No further explanation is needed. The same is not true with respect to descriptions of secured indebtedness for two reasons. First, a security agreement may secure debts not specifically identified therein. Second, the balances due on secured debts are not ascertainable from the face of the security agreement. While the rule stated in *Helms* that a subsequent lender need not look further than the security agreement is perfectly sensible with respect to collateral description questions, it makes no sense at all with respect to secured debt identification. This Court determines that the *Helms* rule of limited inquiry cannot be applied where the question is what debts are secured by a security agreement.

In light of the definitions of "Note," "Indebtedness" and "Related Documents" set forth in the ASA, it may secure not only the designated promissory note, but renewals, extensions, modifications, refinancings, consolidations and substitutions of that note, as well as other related indebtedness. So the TRUSTEE'S contention that a reasonable subsequent lender who couldn't "find" an SBT note dated December 13, 2008, could make no further inquiry and be justified in concluding that the ASA secured no debt, ignores the plain terms of the ASA, defies common sense and is contrary to the universal concern of banks and their regulators that lending practices promote a bank's safety and soundness.

For the foregoing reasons, the Court determines that the ASA created a security interest in the sold equipment, that the ASA was effective to secure the debt evidenced by the December 15, 2008 Note as between SBT and the DEBTOR, that it was effective against purchasers and creditors and thus effective against the TRUSTEE. The excess equipment

16

proceeds are SBT's collateral and will be ordered released to SBT to apply to the December 15, 2008 Note.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###